IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ALFRED SERGIO NICKSON,

              Petitioner,               No. CIV S-06-0608 JAM GGH P

     vs.

CHERYL PLILER,

              Respondent.          FINDINGS AND RECOMMENDATIONS

_____/

I.  <u>Introduction</u>

       Petitioner is a state prisoner proceeding through counsel with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2002 conviction for first degree murder and attempted robbery.  Petitioner is serving a sentence of 25 years to life.

       Petitioner raises six claims of jury instruction error and one claim of ineffective assistance of appellate counsel.  After carefully considering the record, the court recommends that the petition be denied.

II.  <u>Anti-Terrorism and Effective Death Penalty Act (AEDPA)</u>

       The Antiterrorism and Effective Death Penalty Act (AEDPA) applies to this petition for habeas corpus which was filed after the AEDPA became effective.  <u>Neelley v. Nagle</u>, 138 F.3d 917 (11th Cir.), citing <u>Lindh v. Murphy</u>, 521 U.S. 320, 117 S. Ct. 2059 (1997).  The

1

1   AEDPA "worked substantial changes to the law of habeas corpus," establishing more deferential

2   standards of review to be used by a federal habeas court in assessing a state court's adjudication

3   of a criminal defendant's claims of constitutional error.  Moore v. Calderon, 108 F.3d 261, 263

4   (9th Cir. 1997).

5           In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme

6   Court defined the operative review standard set forth in § 2254(d).  Justice O'Connor's opinion

7   for Section II of the opinion constitutes the majority opinion of the court.  There is a dichotomy

8   between "contrary to" clearly established law as enunciated by the Supreme Court, and an

9   "unreasonable application of" that law.  Id. at 1519.  "Contrary to" clearly established law applies

10  to two situations:  (1) where the state court legal conclusion is opposite that of the Supreme

11  Court on a point of law, or (2) if the state court case is materially indistinguishable from a

12  Supreme Court case, i.e., on point factually, yet the legal result is opposite.

13          "Unreasonable application" of established law, on the other hand, applies to

14  mixed questions of law and fact, that is, the application of law to fact where there are no factually

15  on point Supreme Court cases which mandate the result for the precise factual scenario at issue.

16  Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000).  It is this prong of the

17  AEDPA standard of review which directs deference to be paid to state court decisions.  While the

18  deference is not blindly automatic, "the most important point is that an *unreasonable* application

19  of federal law is different from an incorrect application of law....[A] federal habeas court may not

20  issue the writ simply because that court concludes in its independent judgment that the relevant

21  state-court decision applied clearly established federal law erroneously or incorrectly.  Rather,

22  that application must also be unreasonable."  Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at

23  1522 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the

24  objectively unreasonable nature of the state court decision in light of controlling Supreme Court

25  authority.  Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

26  /////

1       The state courts need not have cited to federal authority, or even have indicated

2  awareness of federal authority in arriving at their decision.  Early v. Packer, 537 U.S. 3, 123 S.

3  Ct. 362 (2002).  Nevertheless, the state decision cannot be rejected unless the decision itself is

4  contrary to, or an unreasonable application of, established Supreme Court authority.  Id.  An

5  unreasonable error is one in excess of even a reviewing court's perception that "clear error" has

6  occurred.  Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003).  Moreover, the

7  established Supreme Court authority reviewed must be a pronouncement on constitutional

8  principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules

9  binding only on federal courts.  Early v. Packer, 537 U.S. at 9, 123 S. Ct. at 366.

10      However, where the state courts have not addressed the constitutional issue in

11  dispute in any reasoned opinion, the federal court will independently review the record in

12  adjudication of that issue.  "Independent review of the record is not de novo review of the

13  constitutional issue, but rather, the only method by which we can determine whether a silent state

14  court decision is objectively unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.

15  2003).

16      When reviewing a state court's summary denial of a claim, the court "looks

17  through" the summary disposition to the last reasoned decision.  Shackleford v. Hubbard, 234

18  F.3d 1072, 1079 n. 2 (9th Cir. 2000).

19  III.  Factual Background

20      The opinion of the California Court of Appeal contains a factual summary.  After

21  independently reviewing the record, the court finds this summary to be accurate and adopts it

22  below:

23      The victim, Kyle Billing, was a young man who had rented an art studio space at a
        warehouse near a light rail station.  On the afternoon of November 17, 1999, he

24      picked up the keys and indicated he was going to move some things into the
        studio.  Around 5:00 p.m., he was shot in the chest while in his car parked nearby.

25      The shooter fired from less than six inches away, and the downward trajectory of
        the .25-caliber bullet was consistent with the victim having been seated and the

26      gun having been pointed at him through the driver's window.  After he was shot,

his car horn sounded for a period of time.  He might have honked the horn himself, but he lost consciousness before help arrived, and he died shortly thereafter.

Although there was evidence that the victim did not smoke, a broken, unused cigarette was found under the front passenger seat of the car.  There were pieces of paper but no cigarette butts in the ashtray.  A cigarette butt was near the rear of the car, and a cigarette lighter was in a plastic bag in the glove compartment.  The victim's wallet, containing $14 and credit cards, was on the floor in the car.

Defendant and two other men, Charles Robinson and Aaron Jones, were charged with the murder and attempted robbery of the victim, and were tried together by separate juries.

Evidence established Robinson was the shooter. [Footnote 1] At trial, defendant

> [Footnote 1: Robinson was convicted of first degree murder and attempted robbery, and his jury found the murder occurred while he was engaged in commission of attempted robbery (§ 190.2., subd. (a)(17)) and both offenses involved intentional and personal discharge of a firearm causing death (§ 12022.53, subd. (d)).  The jury for Jones deadlocked, resulting in a mistrial.  Defendant asks us to take judicial notice of records of later proceedings in Jones's case, which resulted in a negotiated plea agreement.  In defendant's view, Jones was similarly situated and "his disposition informs the prejudice to [defendant] who was convicted of first degree murder and sentenced to an indeterminate 25 years to life."  However, the evidence against Jones and defendant is not identical, and defendant's jury, unlike Jones's, reached a verdict.  Accordingly, the records in Jones's case have no bearing on this appeal, and we deny the request for judicial notice.  (Mangini v. R.J. Reynolds Tobacco Co. (1994) 7 Cal.4th 1057, 1063 [judicially noticed material must be relevant to issue at hand].)]

admitted that he and Jones were present when Robinson shot the victim during an attempted robbery.  Given the limited issues presented, the following factual summary focuses on defendant's statements and other evidence relating to his intent and level of involvement in the shooting.

Earlier that day, defendant was involved with Robinson and Jones in a plan to rob Xiong's Mini Market.  The owner of the market testified that three young black men came to the store sometime between noon and 3:00 p.m.  One of them bought a soda, one walked around, and one talked to the owner.  The owner felt threatened and was concerned that the men were going to try to do something to her, even though they did not say so.  However, they left without incident.

Donald Hall testified that he was working at a hockey arena that afternoon.  Robinson came to the arena and Hall returned some money and possibly some headphones he had borrowed.  Hall initially spoke with Robinson inside, but later went outside where he saw Robinson with Jones and possibly one other man.  Hall had previously told police there were two men with Robinson and that someone made a comment which caused Hall to be concerned that they wanted to

rob the arena.  To discourage them, Hall said there were police inside and no money there.

*Defendant's Statement to Detective Woodward*

Detective Troy Woodward interviewed defendant on November 26, 1999, after speaking with Jones.  A videotape of the interview was played to the jury.

Defendant admitted that he went to Xiong's Mini Market [footnote 2] and the

> [Footnote 2: Detective Woodward erroneously referred to it as "Hong's" Market, as did defendant at some points when he later testified at trial.]

hockey arena with Robinson and Jones on the day of the shooting and that he had a pellet gun with him in his backpack.  Defendant initially denied intending to rob the market, but he eventually acknowledged that a robbery might have occurred if the circumstances were right.  As to the hockey arena, defendant responded in the affirmative when asked if Hall commented that he knew they were not "stupid enough to try and rob this place."

Defendant stated that he, Robinson, and Jones walked to the light rail station and discussed how they could "get paid" because defendant needed money.  Defendant acknowledged that he had meant getting money by "any means necessary" and that he thought about robbery.  According to defendant, someone else talked about being "ready to get paid," but defendant said he was concerned about getting caught, and subsequently left.

Defendant said he was gone for 10 to 15 minutes, although he initially declined to say exactly where he went.  He eventually told Detective Woodward that he was supposed to meet his girlfriend, Jackie Allen, downtown "[s]omewhere around...4:00-ish, what ever," "5:00, 6:00, around that time," but she was not there.  Defendant returned and rejoined Robinson and Jones.  Defendant noticed police in the area at some point and looked at Robinson and Jones.  However, they did not say anything.  Defendant claimed he never saw Robinson with a gun and never heard or saw the shooting.

*Jackie Allen*

Consistent with what she previously had told the police, Jackie Allen testified she had planned to meet defendant downtown that afternoon, between 2:00 p.m. and 3:00 p.m., but he did not show up.

Near the time of jury selection, defendant wrote a letter to Allen that contained threats.  After saying that defendant knew Allen had talked to the prosecutor, the letter stated: "you know it's one thing if you didn't want to come to my trial for moral support, which looks good in front of the jury.  Then it's a whole different thing when you're totally making an attempt to do me in. [¶] ...[¶]...Truly, Jackie, if you want to be a snitch, then you should be silenced like one, feel me?[]  Later, the letter stated: "Or instead of doing something like having you murdered, I could have you whooped on and then send the paperwork to the street and make your life a living hell."  The letter said: "[Y]ou have three choices: A, get on the stand

and plead the fifth, B, get on the stand and say you lied to help me, then realized the truth would help me more, C, totally disappear like I thought you did.  To me B or C, thus more so B.  So please help me.  I'll give you the story to tell."  Later in the letter, defendant wrote that he had spoken with his attorney and that "as far as A, he informed me you have nothing to plead the Fifth about," and that "[h]e feels you're a moron," so "you don't have what it takes for B..."  Thus, the letter states "So vanish it is," suggesting she was "safe to go" to Pennsylvania or "[m]y people in Texas will take you."

*Defendant's Testimony*

Defendant testified as follows: He had lost his job the day before the shooting, and his mother had kicked him out of her house.  He happened to see Robinson whom he knew through a mutual friend, and Robinson told him of a store (Xiong's Mini Market) where there was a large amount of money in a safe.  At first, defendant said he was not interested, but he ultimately agreed to rob the market with Robinson and Jones.

The three went to the market.  After Robinson bought a soda and pointed out some things, they left and defendant got his backpack containing an unloaded shotgun that belonged to a friend.  Defendant showed the gun to Robinson and Jones, telling them he did not want to hurt anyone and was just trying to "get paid."  Robinson then obtained a small, semiautomatic gun from a friend.  The plan was that defendant would cover Jones at the front of the market while Robinson went to the back and emptied the safe.

The three returned to the market to commit the robbery, but left after Jones became nervous and started shaking.  Again, they discussed the robbery and using the owner's car for the getaway.  They went back to the market later, but Jones just stood there and defendant had a bad feeling, so they left once again.  Defendant told Robinson in Jones's presence that he was "out," meaning defendant did not want "anything more to do with that."

When defendant told them he was supposed to meet his girlfriend and her friend, Robinson said he would join them, but wanted "to check something out" first.  Robinson's girlfriend then came by in a truck, picked up the three men, and drove them to the hockey arena, where she left them.  Robinson went inside and came out with Donald Hall, who said he hoped they were not planning to rob the place.  Defendant "laughed it off," saying something to the effect, "I know you're not talking to me."

Although claiming the robbery scheme had ended at Xiong's Mini Market, defendant admitted that he talked further with Robinson and Jones about getting "paid."  By this, he did not necessarily mean a robbery.

Shortly before or at 5:00 p.m., the three men went to the light rail station.  After defendant commented about missing one of the trains, Robinson said he felt like killing someone because "shit ain't going right today."  Defendant did not take Robinson seriously and said it was best they had not done anything that day.  Robinson took out a cigarette and asked defendant and Jones if they had a light, but neither did.  When Robinson started to approach a man in a green car, the man

6

drove away.

Robinson then asked Jones and defendant to come with him.  They approached the victim, who apparently was unloading things from his car.  Robinson asked for a light.  The victim nodded and sat down in the car, leaning toward the passenger's side.  When Robinson drew his gun, defendant said something to the effect, "Don't do that man."  Robinson threatened the victim and demanded that he "scoot [his] ass over" and give Robinson his money.  Defendant said to Jones that Robinson was "tripping," and defendant and Jones began to walk away.  The victim and Robinson struggled briefly, and Robinson shot the victim.  Robinson then came over to defendant and Jones and said: "I just popped that fool."

The three men fled.  Defendant still had his backpack with the shotgun, which he temporarily discarded but retrieved a couple of days later.  Defendant told Robinson to "ride [his] own beef" but promised that defendant would not say anything about what had occurred.

Defendant admitted that he had lied to Detective Woodward, explaining that he did so because he did not want to be a snitch and that he also was concerned about protecting himself.  Defendant admitted he wrote the threatening letter to Allen.  According to defendant, he was angry with her because she had cooperated with the prosecutor and her statement was not helpful to him.  Claiming he had been concerned that Allen was not telling the truth, he admitted he was trying to intimidate her.

Defendant also admitted he wrote a letter to Jones encouraging him to testify.  Although defendant asserted that the letter was not threatening on the whole, he did make threatening statements.  For example, he wrote "Surely as [Robinson] and I have many reasons to come after you, and believe me I have the resources."  The letter continued: "My cousin is a [correctional officer] at a certain prison, also my other connections.  Yet not only do you serve a better purpose to me alive, but honestly, brother, that isn't the godly thing to do.  Hence I will not threaten you.  All I will say is that you help me out of that which you helped put me into."  In the letter, defendant recounted what he claimed occurred the day of the shooting and wrote: "I know I don't have to coach you.  Yet I want to make sure you remember key facts.  You told me you already know what to say.  Please take the stand to help me and you.  If you're going to suffer as a snitch in prison, why not change that and...try to go home."  Much of defendant's factual account apparently was consistent with Jones's statement to police, but defendant emphasized certain facts that he wanted Jones to bring out.

Respondent's Lodged Document No. 1, pp. 2-9.

IV.  Legal Standards

    A.  Legal Standard for Jury Instruction Error

    A challenge to jury instructions does not generally state a federal constitutional claim.  See Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983); see also Middleton v.

1  <u>Cupp</u>, 768 F.2d 1083, 1085 (9th Cir. 1985).  Habeas corpus is unavailable for alleged error in the

2  interpretation or application of state law.  <u>Estelle v. McGuire</u>, 502 U.S. 62, 112 S. Ct. 475

3  (1981); <u>see</u> <u>also</u> <u>Lincoln v. Sunn</u>, 807 F.2d 805, 814 (9th Cir. 1987); <u>Givens v. Housewright</u>, 786

4  F.2d 1378, 1381 (9th Cir. 1986).  The standard of review for a federal habeas court "is limited to

5  deciding whether a conviction violated the Constitution, laws, or treaties of the United States

6  (citations omitted)."  <u>Estelle v. McGuire</u>, 502 U.S. at 68, 112 S. Ct. at 480.  In order for error in

7  the state trial proceedings to reach the level of a due process violation, the error had to be one

8  involving "fundamental fairness."  <u>Id.</u> at 73, 112 S. Ct. at 482.  The Supreme Court has defined

9  the category of infractions that violate fundamental fairness very narrowly.  <u>Id.</u> at 73, 112 S. Ct.

10  at 482.

11  B.  <u>Legal Standard for Ineffective Assistance of Appellate Counsel</u>

12  A claim of ineffective assistance of appellate counsel utilizes the same <u>Strickland</u>

13  standard that is applied to trial counsel.  <u>Smith v. Robbins</u>, 528 U.S. 259, 287, 120 S. Ct. 746,

14  765 (2000).

15  The test for demonstrating ineffective assistance of counsel is set forth in

16  <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S. Ct. 2052 (1984).  First, a petitioner must show

17  that, considering all the circumstances, counsel's performance fell below an objective standard of

18  reasonableness.  <u>Strickland</u>, 466 U.S. at 688, 104 S. Ct. at 2065.  To this end, the petitioner must

19  identify the acts or omissions that are alleged not to have been the result of reasonable

20  professional judgment.  <u>Id.</u> at 690, 104 S. Ct. at 2066.  The federal court must then determine

21  whether in light of all the circumstances, the identified acts or omissions were outside the wide

22  range of professional competent assistance.  <u>Id.</u>, 104 S. Ct. at 2066.  "We strongly presume that

23  counsel's conduct was within the wide range of reasonable assistance, and that he exercised

24  acceptable professional judgment in all significant decisions made."  <u>Hughes v. Borg</u>, 898 F.2d

25  695, 702 (9th Cir. 1990) (citing <u>Strickland</u> at 466 U.S. at 689, 104 S. Ct. at 2065).

26  /////

1    Second, a petitioner must affirmatively prove prejudice.  Strickland, 466 U.S. at

2    693, 104 S. Ct. at 2067.  Prejudice is found where "there is a reasonable probability that, but for

3    counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at

4    694, 104 S. Ct. at 2068.  A reasonable probability is "a probability sufficient to undermine

5    confidence in the outcome."  Id., 104 S. Ct. at 2068.

6    In extraordinary cases, ineffective assistance of counsel claims are evaluated

7    based on a fundamental fairness standard.  Williams v. Taylor , 529 U.S. 362, 391-93, 120 S. Ct.

8    1495, 1512-13 (2000), (citing Lockhart v. Fretwell, 113 S. Ct. 838, 506 U.S. 364 (1993)).

9    The Supreme Court has recently emphasized the importance of giving deference

10    to trial counsel's decisions, especially in the AEDPA context:

11    In Strickland we said that "[j]udicial scrutiny of a counsel's
      performance must be highly deferential" and that "every effort

12    [must] be made to eliminate the distorting effects of hindsight, to
      reconstruct the circumstances of counsel's challenged conduct, and

13    to evaluate the conduct from counsel's perspective at the time."
      466 U.S., at 689, 104 S.Ct. 2052.  Thus, even when a court is

14    presented with an ineffective-assistance claim not subject to §
      2254(d)(1) deference, a [petitioner] must overcome the

15    "presumption that, under the circumstances, the challenged action
      'might be considered sound trial strategy.'"  Ibid. (quoting Michel

16    v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)).

17    For [petitioner] to succeed, however, he must do more than show
      that he would have satisfied Strickland's test if his claim were

18    being analyzed in the first instance, because under § 2254(d)(1), it
      is not enough to convince a federal habeas court that, in its

19    independent judgment, the state-court decision applied Strickland
      incorrectly.  See Williams, supra, at 411, 65 S. Ct. 363.  Rather, he

20    must show that the [ ]Court of Appeals applied Strickland to the
      facts of his case in an objectively unreasonable manner.

21

22    Bell v. Cone, 535 U.S. 685, 698-699, 122 S. Ct. 1843,1852 (2002).

23    V.  Discussion

24    A.  Claim One

25    Petitioner raised the claims raised in claim one in his petition for writ of habeas

26    corpus filed in the California Supreme Court.  The California Supreme Court summarily denied

9

1   this petition.  Respondent's Lodged Document no. 12.

2          Petitioner cannot contest here his allegations that the state court in his case, or

3   state courts in general, are erroneously interpreting state law.  Estelle v. McGuire, 502 U.S. 67-

4   68, 112 S.Ct. 475 (1991).  Nor can petitioner assert that he has a liberty interest in the "correct"

5   interpretation of state law.  Langford v. Day, 110 F.3d 1380, 1389 (9th Cir. 1997) (petitioner

6   cannot transform a state law issue into a federal claim by claiming "due process" error).  The one

7   exception to the above rules exists where the state court has used a patently incorrect

8   interpretation as a subterfuge to avoid the federal issues.  Oxborrow v. Eikenberry, 877 F.2d

9   1395, 1399 (9th Cir. 1989).  In addition, to the extent that petitioner asks this court to find that

10  the California Supreme Court erred in *this* case by denying his claim based on state law, he cites

11  no authority that the federal court is authorized to do so.

12         Petitioner argues that the trial court erred in instructing the jury that petitioner

13  could be convicted as a conspirator.  Petitioner argues that "[c]onspiracy is a crime in California,

14  but it is not a theory of criminal liability on which the prosecution can alone establish a

15  conviction for another substantive criminal offense."  Petition, p. 16.  Petitioner goes on to argue

16  that "[d]espite its apparent validation in CALJIC instructions, [footnote omitted], conspiracy as a

17  theory of criminal liability has not been embraced by the California Supreme Court."  Id.

18         In People v. Belmontes, 45 Cal.3d 744, 248 Cal.Rptr. 126 (1988) the California

19  Supreme Court indicated that conspiracy is a theory of criminal liability:

20         It is long and firmly established that an uncharged conspiracy may properly be
           used to prove criminal liability for acts of a coconspirator.  (People v. Lopez
21         (1963) 60 Cal.2d 223, 250, 32 Cal.Rptr. 424, 384 P.2d 16 [uncharged conspiracy
           to commit burglaries admissible to provide identity of murderer]; People v. Pike
22         (1962) 58 Cal.2d 70, 88, 22 Cal.Rptr. 664, 372 P.2d 656 [uncharged conspiracy to
           commit robberies admissible to prove armed robbery culminating in murder].)
23         "Failure to charge conspiracy as a separate offense does not preclude the People
           from proving that those substantive offenses which are charged were committed in
24         furtherance of a criminal conspiracy [citation]; nor, it follows, does it preclude the
           giving of jury instructions based on a conspiracy theory (1962) 57 Cal.2d 415, 447
25         [20 Cal.Rptr. 165, 369 P.2d 714.)"  (People v. Remiro (1979) 89 Cal.App.3d 809,
           842, 153 Cal.Rptr. 89.)

26

1   45 Cal.3d at 788-789, 248 Cal.Rptr. at 150-151.

2          Clearly, petitioner takes issue with state law, and the claim is not cognizable in

3   federal habeas corpus.  Even if this court could rule on state law, pursuant to Belmontes, supra,

4   the trial judge properly instructed the jury that petitioner could be convicted of the substantive

5   offenses based on a conspiracy theory.

6          Petitioner also argues that his appellate counsel was ineffective for failing to raise

7   this issue on appeal.  This ineffectiveness claim arises in a different legal context, i.e., attorneys

8   can be ineffective under the Sixth Amendment if they unreasonably act or make omissions with

9   respect to state law.  In such a case, a federal court must analyze the state law issues to determine

10  whether the attorney acted unreasonably.  However, because the trial judge's instruction was

11  proper, appellate counsel was not ineffective for failing to raise this claim.

12         After independently reviewing the record, the court finds that the denial of these

13  claims by the California Supreme Court was not an unreasonable application of clearly

14  established Supreme Court authority.  Accordingly, this claim should be denied.

15         B.  Claim Two

16         Petitioner argues that the trial court improperly instructed the jury that he could be

17  convicted of murder based on the natural and probable consequences doctrine even if the target

18  offense was not committed.  Petitioner also argues that the "errant instructions lightened the

19  prosecution's burden of proof."  Petition, points and authorities, p. 25.

20         The California Court of Appeal denied this claim for the following reasons:

21         The prosecutor presented two theories of defendant's guilt for murder: co-
           conspirator liability, and aider and abettor liability.
22
           Defendant argues the jury instructions, coupled with the prosecutor's argument,
23         erroneously told the jurors they could convict him of the charged offenses as the
           natural and probable consequence of the earlier, planned robbery of Xiong's Mini
24         Market that was not carried out.

25         The trial court instructed the jury: "In order to be guilty of murder, as an aider and
           abettor to a felony murder, the accused and the killer must have been jointly
26         engaged in the commission of the robbery at the time that the fatal wound was

inflicted. *However, a Defendant may still be jointly responsible for the commission of the crimes charged based upon other princip[le]s of law which will be given to you."* (Italics added; see CALJIC No. 8.27.)  CALJIC No. 3.02, given by the court, informed the jury that one who aids and abets the commission of a crime may be liable for "any other crime committed by a principal which is a natural and probable consequence of the crime originally aided and abetted."  The instruction further stated in pertinent part: "In order to find the Defendant guilty of the crime of murder, as charged in Count 1, you must be satisfied beyond a reasonable doubt that: [¶] One, the crime of attempted robbery was committed; [¶] Two, that the Defendant aided and abetted that crime; [¶] Three, that a co-principal in that crime committed the crime of murder; and [¶] Four, the crime of murder was a natural and probable consequence of attempted robbery."

During summation, the prosecution argued in part: "The rules to aiders and abettors in terms of liability are pretty much the same as they are with co-conspirators.  One who aids and abets another in the commission or attempted commission of a crime is not only guilty of that crime, but is also guilty of any other crime committed by a principal which is a natural and probable consequence of the crime originally aided and abetted.  What's that?  The idea, "Hey, I go with the guy to rob Xiong's.  I'm in.'  Look at all the evidence again, 'I go with him to rob Donnie Hall's place of business.  I'm in.'  'I'm walking along going to the ...Lightrail Station.  He says stroll with me.  I'm in.' [¶] Well, it is a natural and probable consequence.  That's the same definition I used before, the same definition of natural and probable consequence, that same question.  Is the robbery of a person a natural and probable consequence of an agreement to rob the store?  And the answer is the same as it was before.  Absolutely.  Absolutely."

According to defendant, the instructions and argument were erroneous to the extent they told the jury that as an aider and abettor, he could be convicted of the murder of the victim if it was a natural and probable consequence of the aborted plan to rob the market.  This is so, defendant argues, because in his view, "where, as here, a target crime is not committed because of voluntarily abandoning its purpose, that antecedent crime, once abandoned, cannot be used as a target crime in a later, sequential progression of ultimate crimes."

In People v. Prettyman (1996) 14 Cal.4th 248, the California Supreme Court did not decide "whether a defendant may be convicted under the 'natural and probable consequences' doctrine when the target criminal act was not committed."  (Id. at p. 262, fn. 4.)

We, too, need not decide whether the target natural and probable consequences doctrine applies to a target offense that was not committed.  That is so because the jury in this case would have understood that under the instructions and the prosecutor's theories of the case, defendant's liability for murder under the aiding and abetting theory was dependent upon whether the killing was a natural and probable consequence of the attempted robbery of the victim, not the earlier abandoned plan to commit a robbery at the market.

Defendant was charged with attempted robbery of the victim, not attempted robbery at the market.  And the charge of murder alleged that it was committed while the defendants were engaged in an attempted robbery of the victim.  The

jury was so instructed.  And in argument, the prosecutor made it clear that the aiding and abetting theory of defendant's liability for murder was that the killing was the natural and probable consequence of the attempted robbery of the victim, not at the market.

Therefore, when viewed in context, it is readily apparent the prosecutor's argument that robbery of a person was a natural and probable consequence of the agreement to commit robbery at Xiong's Mini Market was simply a response to defendant's position at trial that after the men abandoned that plan, he ended his participation in the robbery conspiracy and did not agree to rob anyone else.  The prosecutor pointed out to the jury: "The facts of the case show you that [defendant] was good to go with Mr. Robinson and Mr. Jones the whole day, that they were just looking from place to place for a target."  In other words, the prosecutor argued, since (1) defendant agreed to "go with [Robinson] to rob Xiong's.  I'm in," then (2) after the plan to rob the store was abandoned, defendant continued to talk about needing to get "paid" and went "with [Robinson] to rob Donnie Hall's place of business [the hockey arena].  I'm in," and then (3) he walked with Robinson to the Lightrail Station, "I'm in," the only reasonable inference is that defendant was part of a continuing plan to rob someone and, consequently, it was inevitable that a person ultimately would become a victim of their ongoing conspiracy to commit robbery.

In sum, neither the instructions in question, nor the argument of the prosecutor, would have led the jury to convict defendant of murder as a natural and probable consequence of the abandoned plan to rob the market but not as a natural and probable consequence of a plan to rob the victim.  Accordingly, the challenged instructions did not adversely affect defendant's substantial rights.

Respondent's Lodged Document No. 1, pp. 10-13.

In a concurring opinion, Justice Sims of the California Court of Appeal, Third Appellate District, agreed with the majority opinion that the jury was properly instructed.  Id., p. 1 (concurring opinion).  However, Justice Sims disagreed with the majority's finding that the prosecutor did not argue in closing argument that the killing of the victim was a natural and probable consequence of the agreement to rob the store.  Id.  Justice Sims found that the prosecutor actually made this argument, that this argument constituted misconduct because the killing of the victim could not have been a natural and probable consequence of the agreement to rob the store which had ended, but that defendant's failure to object to the misconduct waived the claim.  Id., pp. 2-3.

In the instant petition, petitioner argues that the jury instructions coupled with the prosecutor's argument misled the jury regarding the natural and probable consequences doctrine.

1   However, petitioner does not raise a separate claim of prosecutorial misconduct.  Accordingly,

2   the court will not directly reach this misconduct claim, which may well have been waived by trial

3   counsel's failure to object during trial.  Nevertheless, an erroneous argument of counsel may well

4   exacerbate the ill effect of an erroneous or ambiguous instruction.

5         Sarausad v. Porter, 479 F.3d 671 (9th Cir. 2007), vacated in inconsequential part,

6   503 F.3d 822 (9th Cir. 2007), *cert. granted,* Waddington v. Sarausad, 128 S.Ct. 1650 (2008),

7   contains an almost identical issue.     In that case, the Ninth Circuit reviewed accomplice liability

8   instructions given in Washington state.  In Sarausad, "[t]he sole contested legal issue... was

9   whether he could be convicted as an accomplice to murder and attempted murder if he did not

10  know that Ronquillo intended to commit murder."  Id. at 689-690.  As here, a determination of

11  liability for the murder depended upon the defendant's knowledge that the murderer was going to

12  commit *the* underlying crime preceding the murder.  The Ninth Circuit found the given

13  instruction ambiguous, but not infirm, because the instruction did refer to the definite article

14  "the" which would make it more likely that the jury would be focused in on the appropriate

15  underlying crime.

16         The lack of infirmity in the instruction given in petitioner's case is even more

17  clear when viewed in its entirety.  As set forth in the appellate opinion, the jury was instructed

18  that it had to find beyond a reasonable doubt:

19         1. The crime of attempted robbery was committed;

20         2. That the defendant aided and abetted *that* crime;

21         3. That a co-principal in *that* crime committed the crime of murder;

22         4. The crime of murder was a natural and probable consequence of attempted

23         robbery.

24  The specificity and direction afforded to the reader by the word, "that" clearly demonstrates that

25  the murder had to be tied into the underlying robbery directly preceding the murder, and not

26  some other attempted robbery.  There is no error whatsoever in the analysis of the Court of

14

1    Appeal much less any AEDPA error.

2            The interesting problem here, however, is the extent to which a prosecutor's

3    erroneous argument can infect an otherwise legitimate instruction.  This is different from the

4    "usual" problem in which the prosecutor's erroneous argument exacerbates the effect of an

5    incorrect instruction.  See Coleman v. Calderon, 210 F.3d 1047, 1054 (2000) ("The prosecutor's

6    closing argument exacerbated the impact of the misleading instruction...").  Sarausad v. Porter

7    again contains a situation superficially similar to the one presented by this case.

8             To recap – the Sarausad majority determined that the pertinent jury instruction

9    was ambiguous (but not infirm).  The ambiguity in the instruction revolved about "the crime"

10   which the accomplice had to know – was the actual underlying crime to the murder actually

11   known by the accomplice (correct) or was the "underlying crime" another crime of which the

12   accomplice was aware (incorrect).  In determining the likelihood of misapplication, the majority

13   found it significant that the prosecutor had argued (incorrectly) that if the accomplice was "in" on

14   any precedent crime, he was "in" for the murder as well.

15           If the prosecutor in petitioner's case herein incorrectly asserted that, for aiding and

16   abetting, the murder participation in *another* attempted robbery was sufficient to invoke the

17   natural and probable consequence language for murder liability, the argument would give the

18   undersigned pause as the number of attempted robberies involved in this case could easily

19   confuse the jury in application of the aiding and abetting instruction.  However, it appears to the

20   undersigned that during final argument the prosecutor correctly focused on the conspiracy theory

21   and not that of aiding and abetting.  Of course, the conspiracy consisted of the agreement by all

22   three defendants, including petitioner, to commit robbery.  If a murder ensued during the course

23   of *any* robbery associated with the conspiracy, such murder would be the natural and probable

24   consequence of the *conspiracy*.  RT 1386.[1]  Not so for aiding and abetting – the only preceding,

25

26           [1] "A member of a conspiracy is not only guilty of the particular crime that to his
     knowledge his confederates agreed to and did commit, but is also liable for the *natural and*

                                                      15

1  underlying crime that mattered insofar as murder was concerned was the one which directly

2  preceded the murder.  The argument of the prosecutor is given below:

3      ...The key thing here is not whether anyone ever agreed to kill Kyle–there's no
conspiracy to commit murder–but whether they agreed to commit a robbery.  And

4  whether a robbery of a store or an ice rink, from it's a natural and probable
consequence that someone is going to rob a person.

5  RT at 1295.

6      And then, a member of the conspiracy is not only guilty of the particular crime
that to his knowledge his confederates agreed to and did commit–Xiong's Market,

7  the hockey rink–but is also liable for the natural and probable consequences of
any crime of a co-conspirator to further the object of the conspiracy–Kyle

8  Billing–even though that crime was not intended–Kyle Billing again–as a part of
the agreed-upon objective and even though he was not present at the time of the

9  commission of the crime.

10      You get the last part?  Nickson doesn't even have to be there.  If you find there's a
conspiracy and he hasn't withdrawn and the conspiracy is to rob and get paid, he

11  doesn't even have to be there. This is a very broad rule because we recognize
there are some conspirators that have different roles.  Like the lookout, he's not

12  necessarily in the bank.  He's not necessarily present when the guy gets shot, but
he's there.  He's right outside.  He's assisting.

13

14      Now, Mr. Nickson's there, but the point of this instruction is precisely this, that
you don't have to talk to Country ahead of time and say, "You know, what?  If we
happen to come across a young art student who is opening an art studio on Del

15  Paso and Acoma, let's rob him too."  It would be ridiculous.  It would be
ridiculous because we don't have any way of knowing the particular individual is

16  going to be there, but what they know is, man, you got the .25 in your pocket.
I've got the shotgun. We're ready to roll.  We're going to point A, to point B, to

17  point C, going looking for somebody to rob, looking to get paid.  And so the
question is, is it a natural and probable consequence that when you're trying to rob

18  for money from a store that one of you guys might get a little antsy, a little
frustrated and go rob some individual?  Yes.

19

20  RT at 1296-1297.

21      ...Is a robbery of Kyle Billing the natural and probable consequence of a plan to
rob a business?

22

23  RT at 1298.

24

_____

25  *probable consequences* of any crime of a co-conspirator to further the object of the conspiracy,
even though that crime was not intended as an agreed upon objective and even though he was not

26  present at the time of the commission of that crime."  No party takes issue with this instruction.

1
   Second, is a robbery of a person a natural and probable consequence of the
   robbery of a business?  And the answer to that is, the idea is this: We're talking
2
   robbery here, financial gain.  Now, you can imagine this natural and probable
   consequence theory plans in.  You can see a scenario.
3

4 RT at 1360.

5
   You look at all this evidence, and you say to yourself today and tomorrow, "I'm
   convinced.  I know that based on what he told us in court and what Mr. Nickson
6
   told us through his interview to Detective Woodward, that he was a part of that
   robbery.  He was a part of that conspiracy, and he was still in it when Kyle Billing
7
   was murdered."

8 RT at 1364.

9   There is no doubt that understanding the nuances of conspiracy and aiding and

10 abetting would be difficult for this jury (and some lawyers and judges as well).  However, there is

11 no rule that petitioner wins in a habeas corpus action because the jury had a difficult job.  The

12 prosecutor correctly focused upon and argued the conspiracy when asserting that the other

13 robberies had relevance to the murder.  In sum, petitioner's claim that the aiding and abetting

14 jury instruction were erroneous, and/or that the prosecutor's argument infected the instruction is

15 not meritorious.

16   The denial of this claim by the California Supreme Court was not an unreasonable

17 application of clearly established Supreme Court authority.  Accordingly, this claim should be

18 denied.

19   C.  Claim Three

20   Petitioner argues that the instructions allowed the prosecutor to prove him guilty

21 of first degree murder by a lesser standard than beyond a reasonable doubt as a natural and

22 *probable* consequence of the Xiong Market attempted robbery.  As discussed above, the jury was

23 not instructed in connection with aiding and abetting that petitioner could be found guilty

24 pursuant to the natural and probable consequences doctrine based on the Xiong Market attempted

25 robbery.  The Xiong Market attempted robbery was pertinent to the conspiracy theory.

26 Accordingly, the court considers, as did the California Court of Appeal, whether the instructions

1 allowed the prosecutor to prove him guilty of first degree murder by a lower standard as a natural

2 and probable consequence of the robbery of the victim– regardless of the theory utilized.

3       The California Court of Appeal rejected this claim for the following reasons:

4       To support his argument, defendant relies primarily on a line of United States
Supreme Court cases including the recent decision in Blakely v. Washington

5 (2004) ___ U.S. ___ [159 L.Ed.2d 403] (hereafter Blakely).)  The authority
defendant cites is inapposite, and his argument is frivolous.

6

7       In Apprendi v. New Jersey (2000) 530 U.S. 466 [147 L.Ed.2d 435] (hereinafter
Apprendi), the Supreme Court held that "[o]ther than the fact of a prior
conviction, any fact that increases the penalty for a crime beyond the prescribed

8 statutory maximum must be submitted to a jury, and proved beyond a reasonable
doubt."  (Id. at p. 490 [147 L.Ed.2d at p. 455].)  In Blakely, the Supreme Court

9 explained that for the purpose of Apprendi, "the relevant 'statutory maximum' is
not the maximum sentence a judge may impose without any additional findings."

10 (Blakely, supra, ___ U.S. at pp. ___ [147 L.Ed.2d at pp. 413-414], orig. italics.)

11       The authority has no relevance to the issue presented here.  The instructions on
aider and abettor liability did not lessen the prosecutor's burden of proving

12 beyond a reasonable doubt that the victim's murder was a natural and probable
consequence of the attempt to rob the victim.

13 Respondent's Lodged Document no. 1, pp. 23-24.

14       The Apprendi line of cases is not pertinent here.  A jury is permitted to draw

15 permissive inferences from predicate facts proved beyond a reasonable doubt.  Francis v.

16 Franklin, 471 U.S. 307, 105 S.Ct. 1965 (1985).  The "natural and probable consequence" aspect

17 of California state law with respect to conspirator or aider and abettor liability is such an

18 inference.  See Spivey v. Rocha, 194 F.3d 971, 977-78 (9th Cir. 1999).  The denial of this claim

19 by the California Court of Appeal, the last state court to issue a reasoned decision addressing this

20 claim, was not an unreasonable application of clearly established Supreme Court authority.

21 Accordingly, this claim should be denied.

22       D.  Claim Four

23       Petitioner argues that CALJIC 3.00, read to the jury, violated his right to due

24 process by creating a conclusive presumption that an aider and abettor was equally guilty as the

25 principal.  The California Court of Appeal rejected this claim for the following reasons:

26       Defendant argues the trial court erred in giving CALJIC 3.00 because "a

reasonable juror could have interpreted the CALJIC No. 3.00 definition of principals that an aider and abettor was 'equally guilty' as a conclusive presumption, i.e. irrefutable direction that an aider and abettor was 'equally guilty' as the principal."

As read to the jury, the instruction stated: "Persons who are involved in committing or attempting to commit a crime are referred to as principals in that crime.  Each principal, regardless of the extent or manner of participation, is equally guilty.  Principals include: One, those who directly or actively commit or attempt to commit the act constituting the crime, or [¶] Two, those who aid and abet the commission or attempted commission of the crime."

It is true that in some circumstances an aider and abettor may be liable for a lesser or greater crime than the direct perpetrator.  (See, e.g., People v. McCoy (2001) 25 Cal.4th 1111, 1118-1122; People v. Woods, supra, 8 Cal.App.4th at p. 1590.)  But this is not such a case.  As just explained above, if defendant was guilty of murder as an aider and abettor of the crime of attempted robbery of the victim, he and the shooter were equally guilty, as a matter of law, of first degree murder.

Consequently, defendant's claim of instructional error fails.

Respondent's Lodged Document no. 1, pp. 16-17.

The court agrees with the reasoning of the California Court of Appeal.  While there may be cases where an aider and abettor may be liable for a lesser crime so that CALJIC 3.00, as read in the instant case, may be improper, petitioner's case was not this case.  If petitioner was guilty of the attempted robbery of the victim, then he and the shooter were equally guilty of first degree murder.  CALJIC 3.00 did not violate petitioner's right to due process.  Again, petitioner mistakes definitions in the substantive law as a conclusive presumption.[2]

The denial of this claim by the California Court of Appeal, the last state court to issue a reasoned decision addressing this claim, was not an unreasonable application of clearly established Supreme Court authority.  Accordingly, this claim should be denied.

E.  Claim Five

Petitioner argues that California's presumption that a petitioner's participation in

---

[2]Indeed, California statutory law differs little from federal law on this point.  See 18 U.S.C. § 3 defining principals.  The federal statute has not been declared unconstitutional by the supreme Court.

a conspiracy continued unless the defense proved withdrawal was a burden-shifting presumption

in violation of the Fourteenth Amendment.  The California Court of Appeal rejected this claim

for the following reasons:

> According to defendant, the instruction with CALJIC No. 6.20 "was a burden-shifting presumption that violated the Fourteenth Amendment Due Process Clause."  (Caps. Omitted.)

> As read to the jury, the instruction stated: "A member of a conspiracy is liable for the acts and declarations of his co-conspirators until he effectively withdraws from the conspiracy or the conspiracy has terminated. [¶] In order to effectively withdraw from a conspiracy, there must be an affirmative and good faith rejection or repudiation of the conspiracy which must be communicated to the other conspirators of whom he has knowledge. [¶] If a member of a conspiracy has effectively withdrawn from the conspiracy, he is not thereafter liable for any act of the co-conspirators committed after his withdrawal from the conspiracy, but he is not relieved of responsibility for the acts of his co-conspirators committed while he was a member."

> Defendant claims this instruction impermissibly shifted to him the burden of proving, as a defense, that he withdrew from the conspiracy.  We disagree.

> "A mandatory rebuttable presumption does not remove the presumed element from the case if the State proves the predicate facts, but it nonetheless relieves the State of the affirmative burden of persuasion on the presumed element by instruction the jury that it must find the presumed element unless the defendant persuades the jury not to make such a finding.  A mandatory rebuttable presumption is perhaps less onerous from the defendant's perspective, but it is no less unconstitutional."  (Francis v. Franklin (1985) 471 U.S. 307, 317 [85 L.Ed.2d 344, 355].)

> "Because a mandatory rebuttable presumption 'tells the trier of fact that he or they *must* find the element fact upon proof of the basic fact, at least until the defendant has come forward with some evidence to rebut the presumed connection between the two facts,' it is a 'troublesome' evidentiary device in a criminal case since the prosecution bears the burden of establishing guilt beyond a reasonable doubt."  (People v. McCall (2004) 32 Cal.4th 175, 183, quoting Ulster County v. Allen (1979) 442 U.S. 140, 157 [60 L.Ed.2d 777, 792].)

> The instruction relating to withdrawal from a conspiracy is not an "evidentiary device" upon which the People may rely to circumvent the burden of proof.  The fact that a defendant is liable for certain crimes of a coconspirator until he effectively withdraws from a conspiracy is simply an established rule of the law of conspiracy.  (See e.g., People v. Prieto (2003) 30 Cal.4th 226, 250; People v. Chait (1945) 69 Cal.App.2d 503, 514.)  Hence, the rule may not be characterized as an unconstitutional presumption.  (See People v. McCall, supra, 32 Cal.4th at p. 189 ["Substantive due process allows lawmakers broad powers to select the elements of crimes, and to define one thing in terms of another"].)

1    Indeed, California Supreme Court authority cited by defendant upheld CALJIC
     No. 6.20 against a claim that it shifted the burden of proof.  As the Supreme Court
2    explained in People v. Belmontes (1988) 45 Cal.3d 744: "We further reject
     defendant's argument that instructing the jury in accordance with CALJIC No.
3    6.20 (that only an affirmative and bona fide rejection or repudiation of the
     conspiracy communicated to the coconspirators will effectuate withdrawal from
4    the conspiracy) impermissibly shifted the burden of proof on such matter to him.
     As we stated in People v. Crosby (1962) 58 Cal.2d 713, 731: 'It is not part of the
5    People's prima facie case to negate the possibility of such a withdrawal.  Once the
     defendant's participation in the conspiracy is shown, it will be presumed to
6    continue unless he is able to prove–as a matter of defense–that he effectively
     withdrew from the conspiracy...' [¶] Under CALJIC No. 6.20 the burden is upon
7    the defendant to go forward with evidence of his withdrawal from the conspiracy.
     His burden is one of production–not persuasion beyond a reasonable doubt of his
8    nonmembership in the conspiracy." (People v. Belmontes, supra, 45 Cal.3d at pp.
     790-791.)  In fact, the defense need not produce anything; instead, it may
9    reasonably rely on any evidence adduced to raise a doubt as to whether the
     conspiracy continued or whether there was an effective withdrawal from it.
10   Respondent's Lodged Document No. 1, pp. 17-20.

11        Because the prosecution had no burden to prove the non-withdrawal from the

12   conspiracy, the California Court of Appeal's finding that CALJIC 6.20 did not create an

13   impermissible burden-shifting, the last reasoned decision by a state court addressing this claim,

14   was not an unreasonable application of clearly established Supreme Court authority.

15   Accordingly, this claim should be denied.

16        F.  Claim Six

17        Petitioner argues that his right to due process was violated by the trial court's

18   failure to sua sponte instruct on his allocated weight on the burden of proving withdrawal from

19   the conspiracy.  The California Court of Appeal denied this claim as follows:

20        We also reject defendant's claim that "the jury should have been instructed sua
          sponte that the defendant was simply allocated to produce [sic] evidence, coming
21        from the prosecution or defense, that would raise a reasonable doubt of
          withdrawal [from a conspiracy] so as to excuse, justify, or mitigate the murder and
22        attempted robbery."

23        "It is the trial court's duty to see that the jurors are adequately informed on the law
          governing all elements of the case to the extent necessary to enable them to
24        perform their function."  (People v. Reynolds (1988) 205 Cal.App.3d 776, 779,
          overruled on other grounds in People v. Flood (1998) 18 Cal.4th 470, 484, 490 &
25        fn. 12.)  Thus, a "trial court must instruct the jury on the allocation and weight of
          the burden of proof [citations], and, of course, must do so correctly.  It must give
26        such an instruction even in the absence of a request [citation], inasmuch as the

21

allocation and weight of the burden of proof are issues that 'are closely and openly connected with the facts before the court, and...are necessary for the jury's understanding of the case' [citation]."   (People v. Mower (2002) 28 Cal.4th 457, 483-484.)

For example, the trial court may be required to clarify the reasonable doubt standard as it applies to certain defenses (see, e.g., People v. Mower, supra, 28 Cal.4th at pp. 483-484; People v. Simon (1995) 9 Cal.4th 493, 501), or to instruct the jury that, if there is a reasonable doubt as to whether defendant is guilty of a greater or a lesser offense, then the jury should convict him of the lesser offense (see, e.g., People v. Aiken (1971) 19 Cal.App.3d 685, 703, disapproved on another ground by People v. Lines (1975) 13 Cal.3d 500, 514).  On the other hand, instructions relating specific facts to a legal issue may be characterized as "pinpoint" instructions that need not be given if not requested.  (See, e.g., People v. Saille (1991) 54 Cal.3d 1103, 1119-1120 [voluntary intoxication's relevance to mens rea].)

Here, the instructions were adequate to guide the jury in its consideration of the issue of withdrawal from the conspiracy.  Defendant does not dispute that the jury received appropriate instructions on the presumption of innocence and the prosecutor's burden of proving him guilty beyond a reasonable doubt.  (CALJIC No. 2.90.)  And as indicated by our discussion of the last issue, CALJIC No. 6.20 does not set forth or imply a contrary burden of proof.  Nor does the instruction suggest that the type of evidence at issue is evaluated differently from the rest.  Rather, it simply indicates that a conspirator may be liable for crimes committed in furtherance of the conspiracy until there is an effective withdrawal (or the conspiracy is terminated) and is *not* thereafter liable.  Moreover, CALJIC No. 6.11 also states a "member" of a conspiracy may be liable for crimes committed in furtherance of the conspiracy, thereby further emphasizing that current memberships in an active conspiracy is essential.  Reading these instructions in conjunction with those on reasonable doubt and the presumption of innocence, the jury would have found defendant not liable based on a conspiracy theory if there was a reasonable doubt as to whether he still was a member of the conspiracy (as defined by law) at the time the charged crimes were committed.

Our conclusion is supported by the fact that the jury was instructed, when appropriate, that a different burden of proof applied to consideration of an evidentiary matter.  Specifically, the jury was told that a coconspirator's statements may not be considered unless certain predicate facts are proved by a preponderance of the evidence, including that the statements were made at the time a conspiracy existed.  (CALJIC No. 6.24.)  But no such instruction was given with respect to evidence of withdrawal from a conspiracy.

Even the prosecutor emphasized in closing argument that the reasonable doubt standard applied to deciding whether defendant was still a member of the conspiracy at the time of the killing.  The prosecutor explained: "You take a look at everything.  That's what the instruction beyond a reasonable doubt means.  It's after a consideration and comparison of all the evidence, all of it, you cannot state an abiding conviction of the truth of the charge, not just pieces of the evidence...[¶] You look at all this evidence, and you say to yourself today and tomorrow, 'I'm convinced.  I know that based on what he told us in court and

22

1    what [defendant] told us through is interview to Detective Woodward, that he was
     part of that robbery.  He was a part of that conspiracy, and he was still in it when
2    Kyle Billing was murdered.'"

3    There was no instructional error.

4    Respondent's Lodged Document no. 1, pp. 20-23.

5          With respect to sua sponte instructions, no clearly established Supreme Court

6    authority requires the giving of sua sponte instructions.

7          "Failure of a state court to instruct on a lesser offense fails to
           present a federal constitutional question and will not be considered
8          in a federal habeas corpus proceeding." James v. Reese, 546 F.2d
           325, 327 (9th Cir.1976). This general statement may not apply to
9          every habeas corpus review, because the criminal defendant is also
           entitled to adequate instructions on his or her theory of defense.
10         United States v. Kenny, 645 F.2d 1323, 1337 (9th Cir.) ( reh'g and
           reh'g en banc denied, appeal amended ), cert. denied, 452 U.S. 920,
11         101 S.Ct. 3059, 69 L.Ed.2d 425, cert. denied, 454 U.S. 828, 102
           S.Ct. 121, 70 L.Ed.2d 104 (1981) ("jury must be instructed as to
12         the defense theory of the case")

13   Bashor v. Risley, 730 F.2d 1228, 1240 (9th Cir. 1984).

14   See also Solis v. Garcia, 219 F.3d 922, 929 (9th Cir. 2000).

15   Of course, one exception, as pointed out by Bashor is the defendant's actually asking for an

16   instruction on the theory of his case.  The other exception, not possible here, is the necessity to

17   give such instructions in a capital case.  Beck v. Alabama, 447 U.S. 625, 638, 100 S.Ct. 2382

18   (1980).

19         As seen from the previous discussion, petitioner was given an instruction

20   regarding his theory of the case.  CALJIC 6.20.  He was permitted to produce evidence and argue

21   that he had withdrawn from the conspiracy, and he had a jury instruction to back that up.  Here

22   petitioner desired a pinpoint *procedural* instruction.  Federal law simply does not recognize such

23   a claim in habeas corpus that he was entitled *sua sponte* to such an instruction.

24         The finding by the California Court of Appeal that the trial court's failure to sua

25   sponte instruct the jury on petitioner's burden of proving withdrawal from the conspiracy was not

26   an unreasonable application of clearly established Supreme Court authority.  The jury

instructions were sufficiently clear on this point.  Accordingly, this claim should be denied.

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED: July 10, 2008

_____          _____/s/ Gregory G. Hollows_____

nick608.157                       UNITED STATES MAGISTRATE JUDGE